## DAKOTA COAL CO. et al. v. FRASER, Adjutant General of North Dakota et al.

(District Court, D. North Dakota. December 4, 1919.)

Mines and minerals ⬅86½, New, vol. 16A Key-No. Series—Governor held to have power in emergency to operate coal mines.

The Governor of a state in which were coal mines, on the continuous operation of which the people of the state had come to rely for fuel in winter, *held* to have power to seize and operate such mines by state agencies, where the owners refused to operate them, owing to differences with their employés and a resulting strike, which caused the closing down of the mines at the beginning of an unusually severe winter, and where because of a nation-wide strike sufficient coal could not be obtained from outside, and there was certainty of extensive suffering and death if the domestic mines were not operated.

In Equity. Suit by the Dakota Coal Company and the McClure Coal Company against G. A. Fraser, individually and as Adjutant General of the state of North Dakota, and others. On motion for preliminary injunction. Denied.

Order reversed (C. C. A.) 267 Fed. 130.

John E. Greene, of Minot, N. D., and A. W. Cupler, of Fargo, N. D., for plaintiffs.

Seth Richardson, of Fargo, N. D., for defendants.

AMIDON, District Judge. Every strike in a key industry involves three rights, the rights of employer, the rights of employees, and the rights of the public. The greatest of these is the rights of the public. The firm establishment of the supremacy by law of the rights of the public is the next step in the life of the American people. Heretofore the public has been the sufferer. Private rights have been placed above public welfare. Employer and employees have been permitted to fight, while the public has acted simply as a police officer and borne most of the loss. By long suffering we have got sufficient wisdom to end that régime.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

What are the controlling facts of the present coal strike, as they appear in North Dakota? Lignite coal is the fuel of the western half of the state. The industry has been developing there for a period of 25 years. Slowly and steadily it has supplanted other forms of fuel. Domestic and public life have come to depend upon the operation of the mines. The public have been taught by the owners to believe that the coal supply will not be stopped on the verge of winter. Plants have been adapted to the use of lignite. It is not practical to substitute some other fuel, even if that could be obtained.

Lignite is peculiar. It has to be used soon after it is mined. If it is exposed to the weather, it disintegrates and becomes unfit for fuel. So the mines have to be continuously operated, if they are to meet the public needs. The present coal strike was announced to occur on the 1st of November. A few days after that date, and when the Governor of North Dakota acted, an unprecedented storm swept over the state. The mercury fell to 8 to 10 degrees below zero over the whole territory supplied by lignite. There was a large fall of snow, showing that the winter had actually set in, and that from that time forward we must look for steadily falling temperatures.

It was to meet the crisis produced by that situation that the Governor issued his proclamation calling upon the mine owners of lignite mines to operate their mines, and warning them that if they failed to do so they would be taken over by the state and operated. They failed to meet the requirement. He called out the militia and has taken the steps complained of in the bill. The statute of the state and its Constitution authorize the Governor to call out the militia whenever there is imminent danger of violence. The right to call out the militia means, of course, that when he has called them out he may use them in such way as seems reasonably necessary to avoid the disaster for which they are called out.

The question before the court in the present case is: May he deal with the causes which need only the ordinary course of nature to result in death by freezing and by disease, and the disturbed condition of society which would necessarily result from such consequences—I say, may he deal with the causes, rather than wait and deal as a mere police officer with the direful consequences? I answer the question in the affirmative. He may. It is his duty to do so, and it would be an abuse of judicial power in my judgment to define his powers in such a restricted manner as to forbid him to protect society.

The owners of the coal mines had already charged their right of private property therein with a public use. The continuance of the public service which such use involves cannot be separated from the right of private ownership. As to compensation, that can best be fixed by negotiation between the parties. But, if this fails, the state has expressly waived its exemption from suit, and the plaintiff may recover the reasonable value of the use of its property.

I think I know the difference between verbal anarchy and real anarchy. I do not think the quiet and orderly operation of the coal mines, which has taken place under the management of the defendants in this case, can properly be characterized as anarchy. On the con-

trary, if the situation which was presented to the Governor at the time he called out the militia had been permitted to actually arise, and the people had been freezing to death and dying of disease because of the failure of fuel supplies, and men under the excitement of such a situation as that had been driven to acts of violence to relieve themselves against it, that perhaps might have been spoken of as anarchy.

I have seen some anarchy in my day. I have seen anarchy result from allowing the quarrels between employer and employé to take their course with the state acting simply as a police officer. We all witnessed anarchy of that kind in the states of Colorado, West Virginia, and Pennsylvania. It is one of the regular accompaniments of allowing strikes to be fought out while the public acts simply as policeman.

I cannot believe that just men, if their minds were not inflamed by political passions which exist in this state at the present time, would think of characterizing the peaceful operation of the coal mines by the Chief Executive of the state as an act of anarchy. I cannot define the powers of the Governor according to the party who happens to be holding the office. In deciding this case I necessarily have to express views that do not deal with temporary situations. It is a precedent as to what the Chief Executive of an American commonwealth may do. If the crisis which was presented to Governor Frazier had been presented to Governor Hanna, and he had called out the militia and operated the mines, would any just man have considered that he was guilty of an act of anarchy? Suppose the temperature of Illinois shall fall, by the present cold wave that is sweeping the country, to 10 or 12 degrees below zero, and Governor Lowden issues a proclamation calling upon the owners of the bituminous coal mines in Illinois to operate those mines, and warning them that if they fail to do so he will take them over and operate them for the protection of the state, would anybody think of characterizing his act as an act of anarchy?

I will go back to the great anthracite strike in 1902, when Theodore Roosevelt was President, and when he warned the owners of the anthracite mines that if the strike was not settled, and the production of coal resumed, he would take possession of the mines and operate them. I am unwilling to say that, if President Roosevelt had done what he announced he would do, he would have been guilty of an act of anarchy. I know that the American people would have approved his act. I believe it would have been an act performed for the protection of society and within the reasonable scope of executive power, when presented by a crisis that threatened a great loss of human life.

We can get instruction from the experiences of the present strike. One of the outstanding facts is that the mines in North Dakota have actually been operated. The coal has been produced. The rights of private property have only been invaded to the extent that was necessary to safeguard society against a great and threatened disaster. At the same time the power of the nation has been used as I am asked to use the power of the District Court of this district in the present application. All that can be achieved by means of writs of injunction

283 F.—27

has been tried, and it has not produced a ton of coal. Nearly a half million miners continue the strike. As the winter advances, the crisis in the East deepens. It needs only the presence of North Dakota temperatures in that section to call into immediate action something besides injunctions. The reserve executive power is being held in abeyance day by day, waiting negotiations. I cannot doubt that, if the actual crisis arises, the power will be used. In other words, the moment the situation becomes acute, and there is present in the East the same imperative necessity that existed when the lignite mines in the western part of the state were taken over, some power similar to the power which was exercised here will be exercised there, unless the strike is settled, and production of coal is actually begun. To meet such a crisis violent rhetoric is a poor substitute for coal. To meet the needs of the people in the western part of the state mere declamation is no substitute for coal. The only thing that would meet the needs of the situation and safeguard society from a great disaster that was impending was the actual operation of the mines. The mines have been operated here; they have not been operated elsewhere. That is one of the outstanding facts of the present nation-wide strike.

I am asked to issue a writ of injunction which will necessarily say that the acts of the Governor have been illegal and unconstitutional. If I do that, I am not simply dealing with his acts; I am defining the powers of the Chief Executive of an American commonwealth to meet a crisis which threatens loss of life. I am not willing to strip the Governor of his power to protect society. I do not believe it comports with good order, with wise government, with a sane and ordered life, to thus limit the agencies of the state to protect the rights of the public as against the exaggerated assertions of private rights.

The coal mines in the western part of this state, by a long course of life, have been dedicated by their owners to supplying the public with coal. While they as owners performed that duty, they were entitled to the possession of their property. But when, as the result of a quarrel between the owners and their workmen, in the dead of a North Dakota winter, they suspend that service and leave a large district destitute of the fuel upon which it has been taught to rely, I am unwilling to say that the executive officer of the state has not the power to operate the mines, when that seems to be a reasonable and probably the only method by which disaster and resultant disorder can be avoided.

The writ of injunction is not a writ of absolute right. The plaintiffs in this case are applying to a court of equity, which from of old has been called a court of conscience. When it acts, it ought to take into view public as well as private rights. It ought to consider whether, if the writ is issued, it will probably result in obstructing public officers in the performance of what they believe to be their duty, and what seems to be necessary in order to protect society against a great disaster. Viewing the situation in that light, and upon the showing that has been made here, and from that showing finding, as I do, and as I have stated in this opinion, that the acts of the Governor were reasonably necessary to prevent what threatened to be a widespread disaster, I deny the application for a temporary injunction.